IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


SHARON L. ROSS,                       )
                                      )
        Plaintiff,                    )
                                      )
    v.                                )   1:05CV00968
                                      )
MICHAEL J. ASTRUE,[1]                 )
Commissioner of Social Security,      )
                                      )
        Defendant.                    )


### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Plaintiff seeks judicial review pursuant to 42 U.S.C. Section 405(g) of the Commissioner's final decision denying her claims for Social Security disability insurance benefits, a period of disability, and supplemental security benefits. The Commissioner's denial decision became final on May 26, 2005, when the Appeals Council found no basis for review of the hearing decision of the Administrative Law Judge (ALJ). Plaintiff has filed a motion for summary judgment, Defendant has filed a motion for judgment on the pleadings, and the administrative record has been certified to the Court for review.

### The Plaintiff

Plaintiff, who was 45 years old at the time of her hearing in front of the ALJ, has a high school education. Her past relevant

---

[1] Michael J. Astrue was sworn in as Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he should be substituted for Jo Anne Barnhart as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

work experience was as a cashier/checker, fast food worker, fast food cook, groundskeeper, cleaner/housekeeper, and companion. According to the ALJ, Plaintiff alleged disability due to human immunodeficiency virus("HIV"), iron deficiency anemia, headaches, sickle cell trait, depression, somatization disorder, obesity, minimal early degenerative spurring of the left knee, asthma, and a history of polysubstance abuse, all of which the ALJ found to be "severe."

### **Plaintiff's Issues**

Plaintiff has presented two issues to the Court for review: that the ALJ erred in failing to consider the effects of her obesity in accordance with the Commissioner's Ruling, and in assessing her RFC.

### **Discussion**

In reaching a decision on Plaintiff's claim, the ALJ followed the five-step analysis set out in the Commissioner's regulations. See 20 C.F.R. §§ 404.1520 and 416.920. Under the regulations, the ALJ is to consider whether a claimant (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Id. The burden of persuasion is on the claimant through the fourth step. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). If the claimant reaches the fifth step, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that

-2-

the claimant can perform considering her age, education and work experience.  Id.

The ALJ first found that Plaintiff had not engaged in substantial gainful activity since the date of her alleged onset of disability (AOD).  He decided that Plaintiff's severe impairments did not meet or medically equal the requirements of any listing in Appendix 1, Subpart P, Regulation Number 4.

The ALJ further determined that Plaintiff had the residual functional capacity (RFC) to perform simple, routine, repetitive tasks at the light exertional level with a sit/stand option and environmental restrictions.  Based on this RFC, the ALJ concluded that Plaintiff could not return to her past relevant employment.  However, based on the testimony of a Vocational Expert (VE), he found that Plaintiff could perform jobs which existed in significant numbers in the national economy.  Accordingly, the ALJ ruled that Plaintiff was not disabled within the meaning of the Social Security Act.

The scope of review by this Court of the Commissioner's decision denying benefits is limited.  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  The Court must review the entire record to determine whether the Commissioner has applied the correct legal standards and whether the Commissioner's findings are supported by substantial evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Where this is so, the Commissioner's findings are conclusive.  The Court may not reweigh conflicting evidence that is substantial in nature and may not try the case de novo.  Id.  The

Court may not make credibility determinations, or substitute its judgment for that of the ALJ's. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). "Substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (citation omitted), or evidence which "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance," Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citations omitted).

**Issue One**

Plaintiff alleges that the ALJ failed to "follow" Social Security Ruling 02-1p, "in that he failed to consider obesity as an impairment at all the steps of the disability determination process." (Pl.'s Br. at 1-2.) As explained in this Ruling, an impairment is "'not severe' only if it is a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities." 67 Fed. Reg. 57859, 57862. This determination is supposed to occur only after "an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." Id. Ruling 02-1p states that SSA "will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." Id. at 57863.

Indeed, there is no showing the ALJ engaged in such an individualized assessment, but the Ruling contains no requirement

-4-

that such an exercise be set out in the decision. Although Plaintiff relies on two district court cases to support her arguments,[2] the Court finds more persuasive several other district court cases. Most analogous to Plaintiff's claim is that of Prochaska v. Barnhart 454 F.3d 731, 736-37 (7th Cir. 2006). See also Rutherford v. Barnhart 399 F.3d 546, 552-53 (3d Cir. 2005) (refusing to remand when the ALJ did not explicitly consider plaintiff's obesity); Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (finding ALJ's consideration of plaintiff's obesity factored indirectly into his decision).

As in this case, the ALJ's decision in Prochaska did not explicitly address the plaintiff's obesity, but the Court of Appeals found that the ALJ *implicitly* considered the condition "through his review and discussion of her doctors' reports." 454 F.3d at 737. In Plaintiff's case, the ALJ stated that he "afford[ed] controlling weight to the treating and consulting physicians' opinions," and afforded the medical expert's opinion "substantial weight." (Tr. at 18.)

The ALJ first discussed the opinion of the medical expert who testified at Plaintiff's hearing. (See Tr. at 16; see also Tr. at

---

[2]Additionally, the Court finds these cases to be distinguishable. In Boston v. Barnhart, 332 F. Supp. 2d 879 (D. Md. 2004), the Court remanded because the ALJ failed even to mention the plaintiff's obesity. Id. at 885. The Court in Fleming v. Barnhart, 284 F. Supp. 2d 256, 272 (D. Md. 2003), remanded not just because the ALJ failed to address the plaintiff's obesity in assessing RFC, but because the ALJ failed to discuss the *assessment* of RFC. The ALJ in Plaintiff's case fully explained how he arrived at Plaintiff's RFC. (See Tr. at 18. See also pages 16-19, infra.)

-5-

60-62.)  The expert said that Plaintiff's iron deficiency anemia responded well to treatment; she was not currently receiving antiviral treatment for HIV; and her asthma was controlled with appropriate therapy.  Plaintiff's last mental health treatment record stated that her depressive disorder was "under good control."  (Tr. at 506; see also Tr. at 16-17.)  Her treating neurologist reported normal neurological findings (Tr. at 330; see also Tr. at 279), and her treating cardiologist[3] stated that Plaintiff was "able to do all her activities without limitations" (Tr. at 321).

   The ALJ also summarized the report of the consultative examiner, Dr. John Surmonte.  (See Tr. at 17.)  Plaintiff had good range of motion in all her extremities; normal strength; normal gait; good grip strength; normal manipulation; and no motor, reflex or sensory deficits.  (Tr. at 231.)  She was able to stand on her heels and toes, to squat and rise, and to tandem walk.  Dr. Surmonte opined that Plaintiff would be able to sit, stand, move about, lift, carry, and handle objects, although he added that her abilities might be compromised by her HIV status, depression, or asthma.  Consequently, "[a]fter careful consideration of the entire record," the ALJ arrived at Plaintiff's RFC.  (Tr. at 18.)

   As in Prochaska, 454 F.3d at 737, "[a] number of other medical reports relied upon by the ALJ also noted her height and weight." (See, e.g., cited at Tr. at 17, Tr. at 204 (Exh. 4F, weight at

---

[3]The ALJ attributed this statement to Plaintiff's neurologist. (See Tr. at 17.)

237.4); Tr. at 225 (Exh. 5F, "She is approximately 40 pounds overweight."); Tr. at 231 (Exh. 6F, weight is 234); Tr. at 265 (Exh. 9F, weight-226.7); Tr. at 321 (Exh. 14F, weight is 228); Tr. at 435 (Exh. 21F, weight at 226.7); Tr. at 473 (Exh. 22F, weight at 231); Tr. at 499 (Exh. 23F, weight 246).) Yet no caregiver or consultant or expert identified Plaintiff's obesity as aggravating any condition[4] or as contributing to a limitation. See Prochaska, 454 F.3d at 737. Indeed, none of Plaintiff's caregivers even *identified* a limitation. Although Dr. Surmonte proposed that Plaintiff might be limited by her HIV, depression, or asthma, he never suggested that she would be limited by her weight, then at 234 pounds. (See Tr. at 231.) Plaintiff's cardiologist said that she could do all of her activities "without limitations." (Tr. at 321 (weight at 228).)

Plaintiff stated that her "primary limiting difficulty" was her headaches.[5] (Tr. at 225 (Plaintiff "overweight"); see also Tr. at 287.) But her neurologist provided no link between her migraines and her weight (see Tr. at 330-32), nor did any other caregiver. Aside from Plaintiff's two visits with the neurologist (separated by 2-1/2 years), her only recorded treatment for a migraine occurred in March 2002. (See Tr. at 279-80.) On November 21,

---

[4]Plaintiff points to medical records where she reported knee pain, but the accuracy of those records is doubtful. See pages 9-10, infra.

[5]During a period when Plaintiff intermittently experienced chest discomfort (October 2002 through November 2003), she stated/reported that getting "a little short of breath with activities" was her main "limiting feature." (Tr. at 484; see also Tr. at 473.) This ailment apparently resolved, as there are no related complaints after November 2003.

-7-

2003, she reported that she was having no headaches (Tr. at 392), and on November 24, 2003, said that she occasionally "gets a little bit of headache" associated with her blood pressure medication (Tr. at 473 (weight at 231)). A January 2004 record notes, "[N]o new headaches." (Tr. at 464 (weight is 239).) When Plaintiff *did* report a migraine, in June 2004, she said that it resolved without medication. (Tr. at 498-99 (weight at 246).)

As to Plaintiff's back pain,[6] her recorded complaints are minimal. During an anemia evaluation in October 2002, she said that she had occasional low back pain, for about one hour per day, for the previous one to two months. (Tr. at 262 (weight 222.2 (100.8 kg.)).) Plaintiff did not seek treatment for back pain until a year later; she received a diagnosis of lumbar strain. (See Tr. at 394.) In November 2003, she reported that she "really has not had much persistent back pain," and she denied trouble with ambulating. (Tr. at 392.) A treating physician noted in January 2004 that Plaintiff was taking ibuprofen as needed for her musculoskeletal pain, "and that seems to be doing well." (Tr. at 471 (weight at 224).)

Plaintiff also testified that her weight aggravated her asthma, but there is no evidence that Plaintiff sought any treatment for her asthma during the relevant period. In September 2003, her asthma was deemed stable. (Tr. at 438 (weight 227 (103 kg.).) A November 2003 record gives her pulse oximetry as "normal

---

[6]The ALJ did not find Plaintiff's back pain to be a severe impairment.

-8-

on room air." (Tr. at 392.) As of October 25, 2004, Plaintiff had not used her inhaler for the previous six months. (See Tr. at 491 (weight 254 (115.2 kg.).) As with her back and headaches, no caregiver opined that Plaintiff's weight aggravated her asthma.

Plaintiff's brief focuses on her knees, but she told Dr. Surmonte that she had no problems with her arms or legs. (Tr. at 230-31 (weight is 234).) He found that she had good range of motion, 5/5 strength, and a normal gait. (Tr. at 231.) Caregivers described her gait as "fluid" (Tr. at 330) and "normal" (Tr. at 279). Consistently, her extremities had full strength. (See Tr. at 316 (weight at 223), 330, 393; see also Tr. at 279 ("good" strength).) Far from being restricted, Plaintiff received encouragement to exercise. (See Tr. at 265-66 (weight 226.7), 484-85 (weight is 229).)

Plaintiff mentioned "some chronic knee pain" in December 2002 (see Tr. at 315-16 (weight at 223)), but did not seek treatment for same until March 2004 (see Tr. at 425-26 (Plaintiff "[o]bese")). A clinic caregiver referred her to an orthopedist after Plaintiff complained of knee pain during a routine HIV maintenance examination, on February 3, 2004. (Tr. at 428.) According to this record, Plaintiff "was hit by her boyfriend in the left knee two years ago. She has gained about 50 pounds over the past year[.]" (Id.) Per this explanation, the examiner concluded that the "old injury coupled with [the] 50-pound weight is causing the problem in the left knee." (Tr. at 428-29.) An x-ray taken that day showed early degenerative spurring. (Tr. at 430.)

-9-

The transcript, however, contains no report of such an injury, and there is no evidence that Plaintiff gained 50 pounds in the preceding year. On February 13, 2003, she weighed 229 (Tr. at 484), and on January 14, 2004, she weighed 239 (Tr. at 464). In fact, some two years prior to this account, about the time of the alleged attack, Plaintiff weighed 236 pounds! (See Tr. at 207.)

At the orthopaedic visit, Plaintiff reported no instability and no incidents of giving way. (Tr. at 425.) Examination revealed no instability, no grind, and no effusion. (Tr. at 426.) Presumably based on the erroneous information she provided, Plaintiff received advice to continue trying to lose weight. Upon examination the following July, there was neither muscle nor joint swelling *or* pain (Tr. at 512), although there is no showing that Plaintiff had lost weight. She weighed 239 pounds on January 14; 242.5 pounds (110 kg.) on March 16 (Tr. at 422); 246 pounds on June 8 (Tr. at 499); and 249.3 pounds (113.1 kg.) on September 21 (Tr. at 493).

The Court finds that Plaintiff has failed to establish, through objective evidence, that her obesity "further impaired [her] ability to work." Skarbek, 390 F.3d at 504. The Court also finds that Plaintiff's medical records, "relied upon by the ALJ[,] sufficiently analyze[] her obesity."[7] Prochaska, 454 F.3d at 737. Accordingly, as in Skarbek, Rutherford, and Prochaska, the Court

---

[7]As none of Plaintiff's caregivers indicated that Plaintiff's obesity exacerbated her ailments, the Court finds no error in the ALJ not asking the medical expert for "any interactive or 'synergistic' effects." (Pl.'s Br. at 14.)

-10-

determines that the ALJ's failure to specifically consider the effects of Plaintiff's obesity is harmless error.

Moreover, Ruling 02-1p has done nothing to alter the Administration's regulations. The duty to evaluate a claimant's symptoms, imposed by 20 C.F.R. Sections 404.1529(c) and 416.929(c), does not extend to guessing what the impact of those symptoms may be. Rather, 20 C.F.R. Sections 404.1512(c) and 404.1545(a)(3) (and their SSI counterparts in Part 416) explicitly impose upon the claimant the burden of furnishing evidence supporting the existence of a condition and the effect of that condition on the claimant's ability to work on a sustained basis. As neither Plaintiff's medical records, nor her own statements, provide such evidence as to her obesity, any failure of the ALJ to explicitly address Plaintiff's obesity is only harmless error.

Plaintiff further focuses on Dr. Surmonte's suggestion that her HIV, depression, and asthma might interfere with her functional ability. The state consultants, with this information (and noting Plaintiff's weight of 234 pounds, see Tr. at 260), still found that Plaintiff was able to perform medium work.[8] (See Tr. at 254, 305.) The ALJ, however, with "the benefit of the entire record," adjusted Plaintiff's RFC accordingly. (Tr. at 18.) He decreased the

---

[8] "The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds." Social Security Ruling 83-10, 1983-1991 Soc. Sec. Rep. Serv. 24, 30 (West 1992); see also 20 C.F.R. §§ 404.1567(c) and 416.967(c).

-11-

lifting/carrying and standing/walking requirements, and included a sit/stand option, in order to accommodate Plaintiff's knee impairment. The ALJ determined that Plaintiff needed to avoid fumes, gas, and airborne irritants due to her asthma. He then made allowances for her depression by restricting her to simple, routine, repetitive tasks. The Court thus finds that the ALJ incorporated Dr. Surmonte's suggestions[9] into the RFC finding.

Plaintiff objects that Dr. Surmonte neglected to discuss her obesity, other than noting her height and weight. This mention, however, makes it clear that the doctor was aware of Plaintiff's weight. It is only reasonable to assume that he did not discuss her obesity because there was nothing to say about it. Just as Dr. Surmonte suggested that Plaintiff's HIV, depression, and asthma might interfere with her functional ability, he could have proposed the same because of her weight.

Plaintiff claims that "her treating physicians have, when given opportunity, expressed concern about her weight because of the risk factor it poses for someone with severe multiple impairments." (Pl.'s Br. at 16.) The Court might find this a convincing argument--if it were true. By the Court's count, during the relevant period, Plaintiff had 4 office visits[10] in 2001; 14 in 2002; 14 in 2003; and 10 in 2004. Although it would seem that each

---

[9]There is no evidence in the record, and Plaintiff does not allege, that she suffered any limitations from her HIV status.

[10]This count excludes mental health visits and Plaintiff's hospitalizations, but includes emergency room visits.

-12-

visit would pose an "opportunity" to discuss Plaintiff's weight, her citations to the record are minimal, and largely unhelpful.

The AOD is March 31, 2001, but Plaintiff's obesity is not addressed until October 7, 2002, the 10th visit of the relevant period. (See Tr. at 266.) She received common advice we probably have all heard: to increase intake of green, leafy vegetables and fruit; to decrease intake of complex carbohydrates, simple sugars, and fat; and to exercise--directions which she apparently continues to ignore. There is no mention of "risk factors," much less actual restrictions caused by weight.

Plaintiff discusses her treatment for intermittent chest discomfort, but contrary to her implication, the cardiologist did *not* connect her obesity to her complaint. In order to definitively rule out coronary disease (which he did not suspect), he suggested to Plaintiff that she either undergo catheterization or "become active" and then repeat an exercise test (Tr. at 484-85); Plaintiff elected the latter approach. The cardiologist did *not* suggest weight loss.

At the follow-up exam in April 2003, Plaintiff *reported* that "she ha[d] been trying to exercise more and lose weight"; she had lost 8 pounds. (Tr. at 479.) The exercise test, performed on March 13, 2003, "was clinically negative and target heart rate was achieved." (Id.) Nor do the remaining records support a link between Plaintiff's obesity and her chest discomfort. She consulted a doctor on August 5 about chest discomfort, but she had been moving boxes and crates, and the doctor assessed a "strong

-13-

musculoskeletal component." (Tr. at 476.) He advised her to avoid heavy lifting and to take routine over-the-counter analgesics. Although Plaintiff still complained of chest discomfort on November 24, 2003, the doctor remarked that "its character has not changed and it is not increasing in frequency or severity." (Tr. at 473.) Plaintiff did not complain of chest discomfort again, although her weight reached a high thereafter of 115.2 kilograms (254 pounds). (See Tr. at 491.)

Not until February 3, 2004, did a caregiver address Plaintiff's obesity, and that assessment was probably based on Plaintiff's erroneous statement that she had gained 50 pounds in one year. (See Tr. at 428-29.) And this statement most likely prompted the caregiver's advice "to continue efforts at weight loss," during follow-up on March 17, 2004. (Tr. at 426.) While at a routine health maintenance exam in June 2004, Plaintiff complained of pain in her *right* knee. (Tr. at 499.) The caregiver remarked that Plaintiff was "very much overweight and has some mild degenerative joint changes in the right knee,"[11] but makes no other mention of either issue. (Id.)

When Plaintiff had a routine health care visit on October 25, 2004, she had "no complaints," even though her weight was at a record high of 115.2 kilograms (254 pounds). (Tr. at 490-91.) The

---

[11]As there is no record of an exam or radiological study of Plaintiff's right knee, there is no objective evidence in the record to support this finding.

-14-

nurse practitioner referred her to a nutritionist for weight reduction, but included no discussion of Plaintiff's obesity.

Plaintiff's final attempts do not even rely on her *medical* records. Her psychological counselor, a physician's assistant, noted that Plaintiff was taking care of her young grandson who was "wearing her out." (Tr. at 507.) This record, however, makes no connection between Plaintiff's obesity and her fatigue. Plaintiff also points to a letter her "medical case manager" wrote on her behalf, which refers to Plaintiff's knee and back pain, headaches, and depression. (See Tr. at 519.) But the letter discusses neither Plaintiff's obesity nor how it affects the listed ailments. Overall, Plaintiff has not alleged harm sufficient for remand. See Brock v. Chater, 84 F.3d 726, 729 (5th Cir. 1996) ("We will not reverse the decision of an ALJ for lack of substantial evidence where the claimant makes no showing that he was prejudiced in any way by the deficiencies he alleges."); Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996) ("An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where . . . the deficiency probably had no practical effect on the outcome of the case." (citation omitted; alteration in original)); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

-15-

Case 1:05-cv-00968-WO-RAE   Document 15   Filed 11/28/07   Page 15 of 20

**Issue Two**

Plaintiff further complains that the ALJ erred in not setting out how he arrived at Plaintiff's RFC; the Court disagrees. The ALJ first explained that he evaluated the medical evidence, including Plaintiff's subjective complaints, and then assessed her RFC. (Tr. at 15.) He next discussed Plaintiff's testimony, addressing her statement that her headaches and depression were her most disabling impairments, and her complaints about anxiety and depression, left knee pain and weakness, obesity, chest pain, asthma, and history of drug and alcohol abuse. (Tr. at 15-16.)

The ALJ then summarized statements from Plaintiff's agency submissions about her daily activities and lifestyle. (Tr. at 16.) Plaintiff said that she attended church weekly, performed some household chores, and shopped for groceries and clothes. (See Tr. at 122-23.) Plaintiff told the consulting psychiatrist that she also cared for her own personal needs. (See Tr. at 226.) The ALJ noted that the doctor placed Plaintiff's global assessment of functioning ("GAF") at 70,[12] indicating no more than slight

---

[12] Global assessment of functioning ("GAF") "is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" Boyd v. Apfel, 239 F.3d 698, 700 n.2 (5th Cir. 2001) (quoting American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 1994) [hereinafter, the "DSM-IV"]). The GAF Scale, ranging from zero to 100, is divided into ten ranges of functioning, e.g., 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. The lower the GAF score, the more serious the symptoms.

impairment in social or occupational functioning. (See Tr. at 227.)

The ALJ went on to set out the medical expert's testimony that Plaintiff's iron deficiency anemia had responded well to treatment; she was not receiving treatment for HIV; her headaches could be painful and cause irritability and concentration deficits; and her asthma is controlled. (Tr. at 16; see also Tr. at 60-61, 65-66.) The medical expert noted Plaintiff's diagnosis of depression and her GAF of 77. (Tr. at 61; see also Tr. at 512.)

The ALJ discussed Plaintiff's history of mental health treatment for depressive symptoms and polysubstance abuse. (Tr. at 16-17.) He noted that her lowest GAF was only 63, on October 23, 2001. (See Tr. at 182.) Plaintiff's most current mental health records showed that her major depressive order was "'under good control'" with medication and therapy. (Tr. at 16-17 (quoting Tr. at 506.) Plaintiff reported that she was caring for her 11-month-old grandson and was getting services from Vocational Rehabilitation. (Tr. at 507.)

As to Plaintiff's medical records, they show that Plaintiff's headaches are responsive to pain medication. Computed tomography scans of her head were grossly normal, as were her neurological findings. (See Tr. at 330-32.) By November 24, 2003, Plaintiff said only that she "occasionally gets a little bit of headache." (Tr. at 473, quoted at Tr. at 17.) Her asthma and anemia responded to treatment. (See, e.g., Tr. at 438, 447, 491-92.)

-17-

Plaintiff's consultative examination revealed, except for her obesity, only normal physical findings. (See Tr. at 17.) She had full range of motion in all her extremities; normal muscle and motor strength; normal gait and manipulation; good grip strength; and no motor, reflex, or sensory deficits. (Tr. at 231.) Plaintiff could stand on her heels and toes, squat and rise, and tandem walk. Dr. Surmonte opined that Plaintiff should be able to sit, stand, move about, lift, carry, and handle objects, although he proposed that she might be limited by her HIV, depression, and asthma.

Before finally determining Plaintiff's RFC, however, the ALJ assessed her credibility. (See Tr. at 17.) He found that her statements were inconsistent with the objective medical findings and with Plaintiff's descriptions of her daily activities and lifestyle, including her ability to care for her infant grandson and her plans to participate in vocational rehabilitation. Plaintiff has not challenged this finding, and it is supported by the record.

Specifically, the ALJ found that the medical evidence does not support the alleged frequency and severity of Plaintiff's headaches. Her depression was never more than mild and improved when she ceased abusing substances. The ALJ did concede that Plaintiff's somatization disorder would reasonably interfere with her concentration. Her laboratory results indicated that HIV treatment was not yet needed, and her asthma and anemia responded to treatment. (Tr. at 17-18.)

The ALJ noted that the state agency expert found that Plaintiff could perform medium work (see Tr. at 254), but objected that more recent medical records show that Plaintiff's lifting/carrying and standing/walking capacities were now limited by her knee impairment;[13] he adjusted her RFC accordingly. The ALJ further modified the expert's finding to add limitations from Plaintiff's asthma. He fully adopted the state agency psychologist's opinion that Plaintiff should be limited to the performance of simple, routine, repetitive tasks. Based on the above discussion reflecting a lack of impairment from Plaintiff's obesity, and the ALJ's thorough evaluation of her RFC, the Court finds no reversible error in the ALJ not isolating Plaintiff's obesity in deciding her RFC.

Lastly, Plaintiff complains that her case should be remanded because the ALJ's hypothetical to the VE did not include any limitations due to her obesity. At step five of the sequential evaluation, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). "The purpose of bringing in a [VE] is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." Walker v.

---

[13]Plaintiff objects that the ALJ failed to reconcile his finding that her knee impairment interfered with prolonged standing or walking, with a capacity to do light work, relying on another district court case, Masch v. Barnhart, 406 F. Supp. 2d 1038, 1050 (E.D. Wis. 2005). But, the ALJ *did*: he included a sit/stand option in Plaintiff's RFC.

-19-

Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). In order for the VE's testimony to constitute substantial evidence, the ALJ must include in her hypothetical all of the claimant's impairments. See id. at 50 (In order for a VE's opinion "to be relevant or helpful, . . . it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments.").

The hypothetical posed to the VE, however, need only reflect those limitations supported by the record. See Howe v. Astrue, 499 F.3d 835, 841 (8th Cir. 2007); Haynes v. Barnhart, 416 F.3d 621, 629 (7th Cir. 2005); Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); Barnett v. Apfel, 231 F.3d 687, 690 (10th Cir. 2000). The ALJ's hypothetical here conformed to the record as there is no indication that Plaintiff's obesity resulted in any limitations. Although Plaintiff did not testify that her obesity exacerbated her knee impairment, the ALJ included a sit/stand option in the hypothetical. (See Tr. at 72.) Accordingly, the Court finds that the ALJ's hypothetical was not flawed, and the VE's testimony constituted substantial evidence to support the step five finding.

**IT IS THEREFORE RECOMMENDED** that plaintiff's motion for judgment on the pleadings (docket no. 10) be denied, that defendant's motion for judgment on the pleadings (docket no. 13) be granted, and that Judgment be entered dismissing this action.

_____
United States Magistrate Judge

November 28, 2007

-20-

Case 1:05-cv-00968-WO-RAE   Document 15   Filed 11/28/07   Page 20 of 20